Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES, <br><br> Plaintiffs, <br><br> vs. <br><br> EMILY PLATT, National Forest Supervisor; KEITH LANNOM, U.S. Forest Service Deputy Regional Forester; U.S. FOREST SERVICE; U.S. FISH & WILDLIFE SERVICE <br><br> Defendants. | CV-23- <br><br> COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

## I. INTRODUCTION

1.  This is a civil action for judicial review under the Administrative Procedure Act of the U.S. Forest Service's (USFS) and/or U.S. Fish & Wildlife Service's (FWS) authorizations of the Middleman Project (Project) and its Forest Plan amendment, and the elimination of thousands of acres of lynx habitat, on the Helena-Lewis and Clark National Forest (Forest).

2.  Plaintiffs Native Ecosystems Council and Alliance for the Wild Rockies attest that the decisions approving the Project are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.  Defendants' approval of the Project and corresponding documents or lack thereof as written violate the National Environmental Policy Act (NEPA), 42 U.S.C. §4331 et seq., the National Forest Management Act (NFMA), 16 U.S.C. §1600 et seq., the Endangered Species Act, and/or the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq.

4.  Plaintiffs request that the Court either vacate the decision authorizing the Project and Forest Plan Amendment pursuant to 5 U.S.C. § 706(2)(A) and/or enjoin implementation of the Project.

5.  Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs, and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, and/or such other relief as

this Court deems just and proper.

## II. JURISDICTION

6.  This action arises under the laws of the United States and involves the
    United States as a Defendant. Therefore, this Court has subject matter
    jurisdiction over the claims specified in this Complaint pursuant to 28
    U.S.C. §§ 1331, 1346.

7.  An actual controversy exists between Plaintiffs and Defendants. Plaintiffs'
    members use and enjoy the Forest for hiking, fishing, hunting, camping,
    photographing scenery and wildlife, and engaging in other vocational,
    scientific, spiritual, and recreational activities. Plaintiffs' members intend to
    continue to use and enjoy the area frequently and on an ongoing basis in the
    future.

8.  The aesthetic, recreational, scientific, spiritual, and educational interests of
    Plaintiffs' members have been and will be adversely affected and
    irreparably injured if Defendants implement the Project. These are actual,
    concrete injuries caused by Defendants' failure to comply with mandatory
    duties under NFMA, NEPA, ESA, and the APA. The requested relief would
    redress these injuries and this Court has the authority to grant Plaintiffs'
    requested relief under 28 U.S.C. §§ 2201 & 2202, 5 U.S.C. §§ 705 & 706.

9.  Plaintiffs fully participated in the available administrative review processes

for the Project; thus, they have exhausted administrative remedies. Additionally, challenges to a FWS Biological Opinion are APA challenges with no requirement for a 60-day notice. Thus, the Court has jurisdiction to review Plaintiffs' claims.

## III. VENUE

10.   Venue in this case is proper under 28 U.S.C. §1391(e) and Local Rule 3.2(b).  Defendant Lannom resides in Missoula County, which is within the Missoula Division of the United States District Court for the District of Montana.

## IV. PARTIES

11.   Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area. Alliance's members' professional and recreational activities are directly

3

affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems.  Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

12.   Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies.  Its members use and will continue to use the Helena-Lewis and Clark National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing.  The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Helena-Lewis and Clark National Forest, including the Project area.  Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

13.   Defendant EMILY PLATT is the National Forest Supervisor for the Helena-Lewis & Clark National Forest and is the decision-maker whose predecessor signed the Decision Notice and Finding of No Significant Impact for the Project.

14.   Defendant KEITH LANNOM is the Deputy Regional Forester for Region

One/Northern Region of the U.S. Forest Service and is the decision-maker

who denied the administrative objections filed against the Project.

15.   Defendant UNITED STATES FOREST SERVICE (USFS) is an

administrative agency within the U.S. Department of Agriculture, and is

responsible for the lawful management of National Forests, including the

Helena-Lewis and Clark National Forest.

16.   Defendant UNITED STATES FISH AND WILDLIFE SERVICE (FWS) is

an administrative agency within the U.S. Department of Interior and is

responsible for lawful management of species proposed and listed under the

Endangered Species Act.

## V. FACTUAL ALLEGATIONS

**A.    Project and Project Area**

17.   The Middleman Project (Project) is located in the northern Big Belt

Mountains northeast of Helena, Montana within Lewis and Clark, Meagher,

and Broadwater counties and comprises approximately 141,799 acres.

Approximately 95 percent of the project area (134,491 acres) is National

Forest System lands.

18.   Approximately 54% of the Project area (76,580 acres) falls within an

Inventoried Roadless Area.

19.   The Project includes 53,151 acres of tree cutting and burning activities:

    a.      6,669 acres of commercial logging,

    b.      45,934 acres of burning, and

    c.      528 acres of pre-commercial logging.

20.    The Project also includes 46 miles of new temporary road construction and 90 miles of road reconstruction or reconditioning of haul routes for logging.

21.    Of the 90 miles of existing routes, 72.8 miles are currently open to public motorized use, 11.3 miles are closed with a barrier such as a gate or berm, 4.7 miles are revegetated, and 1.2 miles have no barrier.

22.    The use of 17.2 miles of restricted existing routes and construction and use of 46 miles of new temporary routes would result in temporarily increasing motorized access with 63.2 miles of roads during project activities.

23.    The Project allows 644 acres of logging in old growth forest, and 1,160 acres of burning in old growth forest.

24.    The Project includes a Forest Plan amendment to exempt the Project from Forest Plan standards that protect elk:

//

//

| Table 3: Forest Plan Standards and Management Area Exempted to Implement the Middleman Project | |
|---|---|
| **Standard** | **Extent** |
| Forestwide standard 3 requires 50 percent hiding cover on each herd unit (USDA 1986, p. II/17) | The project area occurs within five herd units: Beaver Creek, Elk Ridge, Hedges, Hellgate, and White's Gulch. All five herd units within which the project occurs are currently below standard 3 thresholds for hiding cover. The project will further reduce hiding cover in all herd units. |
| Forestwide standard 3 requires 25 percent thermal cover on winter range for each herd unit (USDA 1986, p. II/17) | All five herd units within which the project occurs are currently below standard 3 thresholds for thermal cover. The project will further reduce thermal cover in four of the five herd units (no thermal cover on winter range would be treated in the Elk Ridge herd unit). |
| Forestwide standard 4a requires open road densities and hiding cover ratios (USDA 1986, pp. II/17-18) | All five herd units within which the project occurs are currently below standard 4a. The project will further reduce hiding cover in all herd units. Temporary road construction is also proposed in four of the five herd units. |
| Forestwide standard 4c requires that winter range be closed to vehicles during the winter (USDA 1986, p. II/18) | The project includes fuel treatments during the winter on winter range which may require some vehicle use on roads closed during the winter season. |
| Forestwide Standard 6 requires that timber harvest openings should not exceed 100 acres (USDA 1986, p. II/19 and Appendix C, C/7) | The project includes units that individually and/or grouped exceed 100 acres and that would thus pose challenges to elk. These openings range from 100 acres to 386 acres. |
| Management area T-3 requires that 35 percent (or 50 percent) hiding cover be maintained and that openings created by timber harvest will be reforested to the extent necessary to meet the hiding cover requirements of big game before harvesting adjacent areas (USDA 1986, p. III/39) | Management area T-3 currently comprises 62 percent hiding cover. Treatments are proposed in hiding cover in T-3 such that hiding cover will drop below Forest Plan thresholds. Also, timber harvest is proposed in T-3 adjacent to openings created by past timber harvest that do not yet provide hiding cover requirements. |

25.     The Forest Service anticipates that the Project will take 15-20 years to

implement.

**B.      Procedural Background**

26.     The Forest Service signed the Decision Notice & Finding of No Significant

Impact authorizing the Project on July 1, 2021.

27.     In the Decision, the Forest Service chose the "modified proposed action,"

which was Alternative 2.

28.     The Decision states that the Forest Plan amendment for this Project was

completed under the 2012 NFMA Planning Rule.

29.     As of the date of the filing of this Complaint, September 26, 2023, no timber

sales have been awarded for this Project.

**C.    Elk**

30.     The Project occurs within five elk herd units:  Beaver Creek, Elk Ridge,

Hedges, Hellgate, and White's Gulch.

31.     The Project will reduce elk hiding cover in all five elk herd units:

| Elk Herd Unit | Existing Hiding Cover Acres/Percent | Post-Project Hiding Cover Acres/Percent |
|---|---|---|
| Beaver Creek | 26,228 (40%) | 18,861 (29%) |
| Elk Ridge | 8,899 (37%) | 7,083 (30 %) |
| Hedges | 20,491 (39%) | 13,545 (26%) |
| Hellgate | 9,147 (29%) | 5,902 (18%) |
| White's Gulch | 11,617 (45%) | 10,805 (42%) |

32.     Thus, the five elk herd units within which the Project occurs will all move

further away from compliance with the Forest Plan standard for elk hiding

cover during the summer, which is a 50% minimum.

33.     In all five elk herd units, the Project will also move the Project area further

away from compliance with the Forest Plan standard for elk security during

hunting season, which uses an index that measures roads and hiding cover:

8

| Elk Herd Unit | Existing Hiding Cover *** Post-Project Hiding Cover | Existing Open Road Density *** During-Project Open Road Density (Including Log-hauling Routes) |
|---|---|---|
| Beaver Creek | 40% *** 29% | 1.10 *** 1.32 |
| Elk Ridge | 37% *** 30% | 0.84 *** 1.35 |
| Hedges | 39% *** 26% | 1.22 *** 1.37 |
| Hellgate | 29% *** 18% | 0.76 *** 0.94 |
| White's Gulch | 45% *** 42% | 0.49 *** 0.49 |

34.     In all five elk herd units, the Project will also move the Project area further

away from compliance with the Forest Plan standard for thermal cover:

| Elk Herd Unit | Existing Thermal Cover Acres/Percent | Post-Project Thermal Cover Acres/Percent |
|---|---|---|
| Beaver Creek | 1,137 (3%) | 971 (3%) |
| Elk Ridge | 55 (5%) | 55 (5%) |
| Hedges | 1,913 (8%) | 1,547 (6%) |
| Hellgate | 1,108 (7%) | 772 (5%) |
| White's Gulch | 3,348 (20%) | 3,103 (19%) |

35.   The Final Big Game Report represents that regarding habitat effectiveness and elk security, "[t]he elk analyses are based on the guidelines found in [the Eastside Assessment]," but the Big Game Report represents that "[t]he methodologies contained in that document are not direction and do not replace existing Forest Plan standards."

36.   The Final Big Game Report defines elk security as "areas that are at least 1.2 miles from motorized routes that are open to the public during hunting season (9/1 - 12/1) that are comprised of at least 23 percent canopy cover. Motorized routes include roads and trails. . . . Private roads are also included in the analysis."  This definition is based upon Lowrey et al (2020).

37.   Elk security as defined by Lowrey et al (2020) will be reduced in three elk herd units, and the remaining two elk herd units already have less than 1% elk security:

| Elk Herd Unit | Existing Elk Security Acres/Percent | Post-Project Elk Security Acres/Percent |
|---|---|---|
| Beaver Creek | 3,510 (5%) | 2,445 (4%) |
| Elk Ridge | 0 (0%) | 0 (0%) |
| Hedges | 963 (2%) | 523 (1%) |
| Hellgate | 7 (less than 1%) | 7 (less than 1%) |
| White's Gulch | 1,941 (8%) | 1,864 (7%) |

38.   Habitat effectiveness measures road density during the summer.

39.   Habitat effectiveness does not measure only roads that are nominally "open" on paper, i.e. legally open to public use, but instead habitat effectiveness must include all roads with actual motorized use:  "Any motorized vehicle use on roads will reduce habitat effectiveness. Recognize and deal with all forms of motorized vehicles and all uses, including administrative use."

40.   The best available science, Christensen et al (1993), states that habitat effectiveness should be 70% or greater for areas intended to benefit elk summer habitat and retain high use.  Areas where elk are one of the primary resource considerations should have habitat effectiveness of 50 percent or greater.

41.   Even when only legally open and log-hauling routes are considered, the Project will reduce elk habitat effectiveness in four elk herd units:

| Elk Herd Unit | Existing Habitat Effectiveness (Including Legally Open Roads Only) | During-Project Habitat Effectiveness (Including Legally Open Roads and Log-Hauling Roads) |
|---|---|---|
| Beaver Creek | 58% | 54% |
| Elk Ridge | 59% | 53% |
| Hedges | 54% | 52% |
| Hellgate | 52% | 51% |
| White's Gulch | 66% | 66% |

**D.    Unauthorized Motorized Use**

42.    The Final Big Game Report in the project file discloses the following: "Illegal, unauthorized road use is not included in motorized route density analyses . . . ."

43.    The Project EA's "[h]abitat effectiveness [analysis] . . . is based on the assumption that the status of a road (i.e. open or closed) is adhered to by the public."

44.    The Final Big Game Report discloses that the habitat effectiveness calculation only includes "motorized route densities open to the public" and 25% of actual private roads.

45.    If all motorized routes were included in the habitat effectiveness calculations, the percentages for the elk herd units would likely drop below

50% habitat effectiveness.

46. Thus, the Project EA's calculations of open road density and habitat effectiveness exclude illegal motorized use, based on an assumption by the Forest Service "that the status of a road (i.e. open or closed) is adhered to by the public."

47. However, the Project EA states:  "On occasion, there has been trespass around gates or gates have been breached through cut locks or gate destruction."

48. Additionally, the Project EA calculation of secure habitat excludes all "open" and "restricted" roads, but does not exclude areas with motorized use on decommissioned roads or motorized use on user-created routes.

49. There have been 145 reported/known instances of illegal motorized use in the Big Belts in the past several years, but the Project EA does not disclose the locations of these breaches, or whether the reports documented user-created routes, motorized use on decommissioned routes, or motorized use on restricted routes.

50. The Project EA contains the following representation:

> Illegal motorized access could occur anywhere on the Forest. While illegal motorized access has the potential to effect individual grizzly bears, the amount, location, duration, and timing of effects resulting from such illegal use is not known. The probability of long-term illegal motorized access and probability of illegal access coinciding with the presence of

grizzly bears is anticipated to be low but is unknown. As such, the potential consequences to grizzly bears are uncertain. Illegal motorized access is expected to be spatially disparate and temporary and is not likely to collectively cause an adverse effect because most Forest users follow travel regulations and when illegal use is observed or when user-created roads become apparent the Forest corrects the situation as soon as they are able.

Because all roads are considered the same (whether open or restricted) for calculating secure habitat for grizzly bears, illegal motorized use of restricted roads does not reduce secure habitat. Secure habitat could only be impacted by off-road use or use of reclaimed/obliterated roads. However, effects of illegal motorized access would not result in a change in the project area's access conditions before, during, or after implementation as such use was not authorized, carried out, or funded by the Forest. Also, illegal motorized access would most likely result in temporary effects to grizzly bears as opposed to a permanent change in motorized access conditions because the Forest corrects the situation as soon as they are able.

**E.      Incomplete Implementation of Big Belts Travel Plan**

51.    The Biological Assessment for the North Belts Travel Plan discloses the fact that 74.2 miles of roads that were supposed to be bermed or gated by the Travel Plan decision have not yet been bermed or gated.

52.    The Project EA does not disclose the existence, much less the location, of these "closed-on-paper" but physically open 74.2 miles of roads in the North Belts Travel Plan area.

53.    The Project analysis does not include these physically open 74.2 miles of roads in the open road density or habitat effectiveness calculations.

54.   It is unclear how or if these 74.2 miles of roads in the North Belts Travel
      Plan area were considered in the secure habitat calculation.

**F.   Concerns of Montana Fish, Wildlife, and Parks**

55.   Montana Fish, Wildlife, and Parks expressed the following concern about
      the Project (emphases added):  "As a result of the Cave Gulch fire and other
      past fires in the project area, thousands of acres of early successional habitat
      currently exist in the project area and there is currently high landscape
      diversity. . . . As such, FWP generally *does not support* the harvest of live
      healthy trees via regeneration harvest techniques to help create openings
      greater than 100 acres, particularly in areas that are adjacent to existing
      large openings.  Creations of such areas will likely result in *significant
      declines in deer and elk use*, if not preclude use of those areas . . . ."

56.   Montana Fish, Wildlife, and Parks expressed the following concern about
      the Project (emphases added):  "FWP believes *it is inappropriate to use
      FWP's hunting district (HD) elk survey information* at the Forest Wide level
      (or even at the HD level) for site-specific projects that negatively impact elk
      habitat. In many of those HDs that overlap with the former Helena National
      Forest land, *large proportions of the total number of elk counted are found
      on private land* during the general hunting season and year-round as well.
      For example, in HDs 391 & 446 (two of the HDs that overlap the

Middleman Project Area) approximately *90- 95% of the elk in the HDs are found on private land* during the general rifle season with the majority of those elk located on private property year-round. FWP believes *one of the primary issues driving the current distribution of elk is the lack of adequate security cover for elk on National Forest land*."

57. Montana Fish, Wildlife, and Parks expressed the following concern about the Project (emphasis added): "There was a lack of reference to and/or use of information and recommendations from the 2013 USFS/FWP Collaborative Elk Habitat Recommendations for the four east-side forests. For example, it is unclear from the information presented in the EA if the elk security and habitat effectiveness analyses used only existing open roads or *included all motorized routes (roads and trails), as recommended in the collaborative recommendations*."

58. Montana Fish, Wildlife, and Parks expressed the following concern about the Project (emphases added): "The Middleman Project will result in *significant reductions in both hiding and security cover* without any planned long-term mitigation for the loss. . . . mitigation strategies designed to address elk security during project implementation and mitigation for loss of cover/security during project implementation does not address the long-term consequences of lack of security resulting from the proposed

action. It *will likely be decades before cover has recovered sufficiently to provide adequate cover/security in the project area*."

59.     Montana Fish, Wildlife, and Parks expressed the following concern about the Project (emphases added): "Elk will likely redistribute to adjacent private property if there is not adequate security habitat available on National Forest land. The *long-term loss of viable public hunting opportunity on National Forest land* will be further exacerbated by failure to mitigate the loss of cover/security long-term. . . . Given that none of the elk herd units within the project area are currently in compliance with USFS standards for big game hiding cover during summer, open road density on fall range, or thermal cover on winter range . . .*FWP urges the USFS to revisit existing travel plans*."

60.     Montana Fish, Wildlife, and Parks expressed the following concern about the Project (emphasis added): "When analyzing the effects of the project to big game, and elk specifically, it is an incorrect assumption that all the untreated timbered areas serve as elk habitat or will be used by elk; within in the project area there are portions that should not be considered elk habitat. . . .Therefore, the *percentage of affected elk habitat is unknown, but likely higher than reported using the current methods*."

61.     Montana Fish, Wildlife, and Parks expressed the following concern about

the Project (emphases added): "A stated Goal of the Helena National

Forest's 1986 plan was to *maintain and improve the habitat over time to*

*support big game* and other wildlife, while a stated Objective of 1986 plan

was the *maintenance or enhancement of elk habitat* throughout the forest.

Emphasis was placed on including a road management program to decrease

human disturbance, and more specifically to implement an aggressive road

management program to *maintain or improve big game security*. This is one

of the several wildlife Forest Plan Standards that the USFS is proposing to

amend in order to carry out this project, *resulting in a divergence from a*

*goal of the 1986 plan*. Currently there is a need to address longterm elk

security issues at either the project level or in the Travel Plans for the Big

Belt Mountains (and other areas)."

**G.  Grizzly bears**

62.  The Big Belt Mountains were historically occupied by grizzly bears.

63.  Grizzly bears may be present in the Project area.

64.  The Project is likely to adversely affect grizzly bears.

65.  The Project falls within "Zone 2" for grizzly bears within the Northern

Continental Divide Ecosystem.

66.  Within Zone 2, management goals include reducing grizzly bear-human

conflicts and allowing grizzlies to move between the Northern Continental

Divide Ecosystem and other large wildland areas (the Greater Yellowstone and Bitterroot ecosystems).

67.  Genetic exchange between grizzly bear ecosystems is necessary for the long-term viability of grizzly bears in the lower 48 states.

68.  The Big Belts are recognized as a linkage zone for grizzly bears, having previously been identified in published connectivity analyses as a potential corridor (along with the Bridger and Gallatin ranges) (Walker and Craighead 1997).

69.  A more recent modeling study again identified the Big Belts as a potential corridor (Peck et al. 2017).

70.  The Forest Plan Grizzly Bear Amendment does not contain any standards or guidelines that limit road density in Zone 2 lands.

71.  FWS states that the "action area" for the Project is the North Belts Grizzly Bear Analysis Unit, which is 215,830 acres, of which 171,431 acres are National Forest lands (79%).

72.  Research has confirmed adverse impacts of roads on grizzly bears.

73.  Negative association with roads arises from the grizzly bears' response to vehicles, vehicle noise and other human-related noise around roads, human scent along roads, and hunting and shooting along or from roads.

74.  Grizzly bears that experience such negative consequences learn to avoid the

disturbance and annoyance generated by roads.

75.   Some bears may not change this resultant avoidance behavior for long periods after road closures.

76.   Even occasional human-related vehicle noise can result in annoying grizzly bears to the extent that they continue to avoid roaded habitat.

77.   In the Northern Continental Divide Ecosystem, Mace and Manley (1993), also referred to as the "South Fork Study," reported use of habitat by all sex and age classes of grizzly bears was less than expected in habitats where total road densities exceeded 2 miles per square mile.

78.   Additionally, the South Fork Study found adult grizzly bears used habitats less than expected when open motorized access density exceeded 1 mile per square mile.

79.   Further, in the South Fork Study, approximately 68% of the adult female composite home range was "core" or "secure" habitat, which was defined as habitat further than 0.5 miles from roads or trails.

80.   Based on grizzly bear habitat use data from the Yellowstone ecosystem, both secure habitat and road densities outside of secure habitat are important predictors of grizzly bear survival (Schwartz et al. 2010).

81.   The main take-away from Schwartz et al (2010) is that secure habitat blocks are useless to grizzly bears if the surrounding road density is too high for a

grizzly bear to travel through in order to reach the secure habitat block.

82. In other words, the secure habitat blocks will be isolated unused islands of habitat if the road densities between the habitat blocks are kept at levels too high for grizzly bears.

83. The Project Biological Opinion states that the action area contains 36% secure habitat for grizzly bears.

84. The Project will reduce secure habitat by 1,636 acres during Project implementation.

85. Thus, the Project will reduce secure habitat in the action area from 36% to 34% during Project implementation.

86. Additionally, the Project allows the use of helicopters (shaded yellow below) in 12,401 acres of secure habitat, which impacts all but one block of grizzly secure habitat in the action area:



87.    Helicopter use is known to displace grizzly bears.

88.    According to the Project analysis, the average open road density for the
       entire North Big Belts Grizzly Bear Analysis Unit (including roadless areas
       and excluding known illegal motorized use) is 1.1 miles/square mile of open
       roads.

89.    According to the Project analysis, the average total road density for the
       entire North Big Belts Grizzly Bear Analysis Unit (including roadless areas
       and excluding known illegal motorized use) is 1.4 miles/square mile of total
       roads.

90.    The Project Biological Opinion provides no analysis of what amount of
       secure habitat, open road density, or total road density, or what amount of
       motorized use on a particular road (i.e. how many trips per year), are
       required to maintain connectivity for a usable grizzly bear movement
       corridor.

91.    The Project Biological Opinion fails to disclose the best available science
       on grizzly bear habitat needs within movement corridors.

92.    The Project Biological Opinion does not disclose the open or total road
       densities between secure habitat blocks in the action area, or the expected
       amount of motorized use on roads between secure habitat blocks (i.e. how

many trips per year).

93.   However, the Project Biological Opinion states generally that there are "high route densities in some portions of" the action area.

94.   Thus, the Project Biological Opinion fails to establish how many, if any, of the secure habitat blocks in the action area are actually accessible to grizzly bears, now or during the Project.

95.   The Project Biological Opinion also fails to analyze the key question of whether current high road density on National Forest lands is the reason that there are not more grizzly bears using the Big Belts for both a movement corridor and/or permanent home ranges, similar to the reason that most elk in this region seek refuge on private lands rather than National Forest lands, as noted above and raised by the State.

96.   An email in the project file states that a grizzly specialist with Montana Fish, Wildlife, and Parks expressly "recommended putting more weight on the Big Belts' connectivity value, in terms of potential genetic exchange between the NCDE and GYE, instead of putting so much weight on the likelihood of female grizzly bears showing up."

97.   The State's grizzly specialist further disclosed information that there "is a clear pattern where dispersing bears select locations based on human activity; specifically, they go where there's less human activity. . . . in the

north Big Belts, when you consider York, Nelson, the extensive road and trail system, private land inholdings, etc. When you compare the level of human infrastructure and use on Forest-administered lands to adjacent ranches and agricultural land, there's clearly more activity on the Forest side, at least on face value."

98.   Thus, one of the key take-aways from the meeting with the State grizzly specialist was that "[b]ig ranches and other less-accessed lands near the Forest boundary are 'islands' with much less human activity compared to Forest-administered land in the Big Belts and Little Belts, and these areas may be more attractive to dispersing bears that Forest-administered lands."

99.   In sum, the State grizzly specialist "recommended focusing more on connectivity value."

100.   The information from the State grizzly specialist was provided to FWS on November 15, 2019.

101.   Additionally, in the Project EA, the Forest Service concedes that the Project will cause "temporary reductions in the ability of the north Big Belts to provide connectivity" and that Project activities "would be a change that interferes with connectivity" and that "[o]verall, proposed activities would decrease connectivity value in the North Big Belts grizzly bear analysis unit during implementation, whether by helicopter use, motorized access, etc."

102.   The cumulative effects section of the Project EA is five sentences and provides no quantified or detailed information.

103.   The cumulative effects section of the Project EA does not disclose or address activities on State or private lands in the grizzly bear analysis unit for the Project.

104.   In the cumulative effects section of the BiOp, FWS acknowledges: "In recent decades, many of the private lands within and adjacent to the Forest have been logged and roaded. Forest regeneration has been erratic and often anemic, and these habitat changes have significantly altered potential habitat opportunities for grizzlies."

105.   The cumulative effects section of the BiOp does not provide details, i.e. quantitative information, on the amount and location of the past logging and roading on private and State lands in the action area, or state that such information is unavailable.

106.   In the cumulative effects section of the BiOp, FWS acknowledges: "With continued forest management on adjacent private and state lands additional road construction is anticipated, resulting in potential effects . . . ."

107.   The cumulative effects section of the BiOp does not provide details, i.e. quantitative information, on reasonably foreseeable logging and roading on private and State lands in the action area.

108.   Between mid-2014 and mid-2019 there were 142 reported violations of road restrictions in the Big Belts.

109.   Examples of illegal motorized access included situations where barriers and/or signs had been compromised.

110.   Between the beginning of January 2020 and the end of March 2021 three violations of road restrictions in the North Big Belts unit were reported, at three different locations. All three violations were situations where a motorist was off route.

111.   In general, the North Big Belts are an open landscape which can make it easier for motorists to find a way around gates.

112.   Even with Forest Service efforts to repair at least some of the compromised gates and fences after illegal motorized use occurs, some individuals may continue to break the law and illegally access parts of the Forest.

113.   Despite the known location of 145 instances of reported illegal motorized use in the Big Belts, and the fact that in many areas it is easy for motorists to simply drive around gates, in the Project Biological Opinion, FWS represents: "the amount, location, duration, and timing of effects resulting from such illegal use is not known" and " illegal motorized access is expected to be spatially disparate and temporary and is not likely to collectively cause an adverse effect because most Forest users follow travel

regulations and when illegal use is observed or when user-created routes

become apparent the Forest corrects the situation as soon as they are able."

114.   Similarly, in the Project Biological Opinion, FWS represents:  "Information

as to the length, duration, amount of illegal use, type of use, and location,

among other conditions, is and will continue to be unknown. As such, the

Service and the Forest are not able to calculate the extent of effects to

individual grizzly bears."

115.   In the cumulative effects section of the Project Biological Opinion, FWS

makes the same or similar representations.

**H.     Lynx**

116.   The Project area falls within mapped lynx habitat referred to as Lynx

Analysis Unit "BB-02," which refers to "Big Belt" unit 2.

117.   Previously, there were two separate Lynx Analysis Units in this area – BB-

02 and BB-03.

118.   The Project EA does not disclose the fact that this Project area used to

overlap both BB-02 and BB-03.

119.   The Project EA states: "During winter 2019-2020, one monitoring survey

was conducted in Lynx Analysis Unit BB-02. The survey crew found tracks

that indicated the possibility of lynx, and a potential lynx sample was

collected in the upper reaches of Magpie Creek. At the time of this

environmental assessment (2020), the Forest was still waiting for confirmation from the DNA lab. For practical purposes, assuming this is a positive detection, the analysis in this report is still valid because the modified proposed action was modified to meet the Northern Rockies Lynx Management Direction in a manner consistent with occupied mountain ranges."

120.   In other words, Lynx Analysis Unit BB-02 may be occupied by lynx.

121.   The Northern Rockies Lynx Management Direction, or "Lynx Amendment," applies to mapped lynx habitat, i.e. it applies to Lynx Analysis Units.

122.   In 2019, the Forest Service remapped Lynx Analysis Units on the Helena-Lewis & Clark National Forest.

123.   In the area relevant to the Project, in part, the Forest Service removed Lynx Analysis Unit BB-03, and added a portion of the previous BB-03 to BB-02.

124.   The Forest Service also reduced the size of BB-02.

125.   In total, the Forest Service reduced the size of BB-02 and BB-03 from 248,195 acres to 125,383 acres, a reduction of 122,812 acres.

126.   The map below shows how the Forest Service reduced the size of BB-02 and BB-03.  The blue outline shows the old Lynx Analysis Unit boundaries, and the red outline shows the new Lynx Analysis Unit boundaries:

//

//



127.   The Project proposes logging and burning activities in areas that were

previously mapped as BB-02 and BB-03, but are no longer mapped as part

of a Lynx Analysis Unit:



128.   The Project EA does not apply the Northern Rockies Lynx Management

Direction to the 122,812 acres of BB-02 and BB-03 that are no longer

mapped as part of a Lynx Analysis Unit due to the Forest Service's 2019

remap.

129. The Forest Service also remapped other Lynx Analysis Units across the Forest in 2019.

130. The Forest Service did not conduct a NEPA analysis for the remap of lynx habitat in 2019.

131. The Project EA does not disclose the 2019 remap of lynx habitat.

VI. CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

*The Forest Plan amendment and Project EA violate NEPA, NFMA, and the APA: this is a significant Forest Plan amendment; the Forest Service failed to analyze reasonable alternatives; the Forest Service failed to fully and fairly disclose and address Montana Fish, Wildlife, and Parks' concerns; and the Forest Service failed to demonstrate compliance with the 2012 NFMA planning regulations.*

132. All previous paragraphs are incorporated by reference.

133. SIGNIFICANT AMENDMENT. A forest plan amendment may be significant if it (1) significantly alters goals or objectives, (2) results in a non-minor change in standards or guidelines, (3) significantly alters the long-term relationship between levels of goods and services originally projected, or (4) affects land and resources throughout a large portion of the planning area. *See* Forest Service Manual 1926.51, 1926.52. In this case, the Forest Service has repeatedly issued "site-specific" Forest Plan

31

amendments to avoid complying with Forest Plan Standards 4a and 3, which

are the primary protections for secure elk habitat on National Forest lands.

Montana FWP has indicated that this is a divergence from the goal of the

Forest Plan and there is currently a serious problem with elk being displaced

from insecure National Forest lands onto private land during hunting

season, which results in a "long-term loss of viable public hunting

opportunity on National Forest land."  Repeatedly exempting logging and

roading projects from the only quantitative limits on logging and roading on

this National Forest exacerbates this elk displacement problem and (a)

results in a failure to comply with Forest Plan objectives and goals to

maintain elk habitat and hunter opportunity, (b) results in a major change to

standards and guidelines intended to maintain elk habitat and hunter

opportunity, (c)significantly limits hunter opportunity on this Forest, and (d)

affects a large portion of this National Forest that is reasonably available to

the public for hunting. For these reasons, the Forest Service's practice of

routinely exempting projects from Standards 3 and 4a amounts to a

significant change to the Forest Plan, and requires analysis as a significant

Forest Plan amendment.

134.   NO REASONABLE ALTERNATIVES.  NEPA requires a reasonable range

of alternatives.  The Forest Service did not consider any alternatives in the

Forest Plan amendment, such as substituting in revised, modified, or new

standards in place of the removal of the existing Forest Plan standards for

elk habitat.  This failure to consider all reasonable alternatives violates

NEPA.

135. MONTANA FISH, WILDLIFE, PARKS' CONCERNS.  In violation of

NEPA, the EA misrepresents or fails to accurately disclose the significant

concerns of FWP regarding elk habitat and this Project.  For example, the

EA fails to fully and fairly disclose the following concerns of FWP:

a.　　Project will "likely result in significant declines in deer and elk use, if

not preclude use of those areas;"

b.　　"primary issues driving the current distribution of elk is the lack of

adequate security cover for elk on National Forest land;"

c.　　"unclear from the information presented in the EA if the elk security

and habitat effectiveness analyses used only existing open roads or

included all motorized routes (roads and trails), as recommended in

the collaborative recommendations;"

d.　　"Project will result in significant reductions in both hiding and

security cover without any planned long-term mitigation for the loss;"

e.　　Project will result in "long-term loss of viable public hunting

opportunity on National Forest land;"

f.    "percentage of affected elk habitat is unknown, but likely higher than reported;" and

g.    "A stated Goal of the Helena National Forest's 1986 plan was to maintain and improve the habitat over time to support big game and other wildlife, while a stated Objective of 1986 plan was the maintenance or enhancement of elk habitat throughout the forest. . . . This is one of the several wildlife Forest Plan Standards that the USFS is proposing to amend in order to carry out this project, resulting in a divergence from a goal of the 1986 plan."

136.  The 2012 NFMA regulations mandate: "The responsible official shall use the best available scientific information to inform the planning process . . . for . . . amending . . . a plan . . . . In doing so, the responsible official shall determine what information is the most accurate, reliable, and relevant to the issues being considered. The responsible official shall document how the best available scientific information was used to inform the . . . amendment decision . . . . Such documentation must: Identify what information was determined to be the best available scientific information, explain the basis for that determination, and explain how the information was applied to the issues considered." 36 C.F.R. §219.3.

137.  The 2012 NFMA regulations mandate: "For every plan amendment, the

responsible official shall:. . . 5) Determine which specific substantive requirement(s) within §§ 219.8 through 219.11 are directly related to the plan direction being added, modified, or removed by the amendment and apply such requirement(s) within the scope and scale of the amendment. . . (i) The responsible official's determination must be based on the purpose for the amendment and the effects (beneficial or adverse) of the amendment, and informed by the best available scientific information, scoping, effects analysis, monitoring data or other rationale. (ii) When basing the determination on adverse effects: (A) The responsible official must determine that a specific substantive requirement is directly related to the amendment when scoping or NEPA effects analysis for the proposed amendment reveals substantial adverse effects associated with that requirement, or when the proposed amendment would substantially lessen protections for a specific resource or use. (B) If the appropriate NEPA documentation for an amendment is a categorical exclusion or an environmental assessment accompanied by a finding of no significant impact (§ 219.13(b)(3)), there is a rebuttable presumption that the amendment will not have substantial adverse effects. (6) For an amendment to a plan developed or revised under a prior planning regulation, if species of conservation concern (SCC) have not been identified for the plan area

and if scoping or NEPA effects analysis for the proposed amendment reveals substantial adverse impacts to a specific species, or if the proposed amendment would substantially lessen protections for a specific species, the responsible official must determine whether such species is a potential SCC, and if so, apply section § 219.9(b) with respect to that species as if it were an SCC."

138.   NONCOMPLIANCE WITH PLANNING REGULATIONS.  *Failure to include standards or guidelines that maintain or restore elk habitat*.  The 2012 Planning Rule requirement for sustainability, 36 C.F.R. 219.8 (a)(1), applies to the Forest Plan amendment.  This provision mandates that the Forest Plan amendment must "include plan components, including standards or guidelines, to maintain or restore the ecological integrity of terrestrial . . . ecosystems and watersheds in the plan area, including plan components to maintain or restore structure, function, composition, and connectivity. . . ." *Id.* Similarly, the 2012 Planning Rule requirement for diversity of plant and animal communities mandates that the Forest Plan amendment "must include plan components, including standards or guidelines, to maintain or restore the diversity of ecosystems and habitat types throughout the plan area. . . . [including] Key characteristics associated with terrestrial . . . ecosystem types[.]" 36 C.F.R. §219.8 (a)(1).  The Forest Plan amendment

contains no such standards or guidelines to maintain or restore elk habitat in the Project area – instead the Forest Plan amendment simply exempts the Project from existing elk habitat standards and replaces them with nothing. This course of action allows the Project to degrade elk habitat in contravention of the mandates of the 2012 Planning Rule.

139. NONCOMPLIANCE WITH PLANNING REGULATIONS. *Failure to determine whether the Forest Plan amendment contributes to the recovery of the threatened grizzly bear.* The 2012 Planning Rule mandates that "the responsible official shall determine whether or not the plan components required by paragraph (a) of this section provide the ecological conditions necessary to: contribute to the recovery of federally listed threatened and endangered species . . . ." 36 C.F.R. § 219.9 (b)(1). The responsible official failed to make a determination as to whether the Forest Plan amendment contributes to the recovery of the grizzly bear, in violation of the 2012 Planning Rule. The amendment is relevant to the grizzly bear because it removes all road density limitations that would otherwise ensure greater security habitat for both elk and grizzly bears. Without the elk road density standards, there are no road density standards to protect grizzly habitat in Zone 2 of the Forest.

140.  NONCOMPLIANCE WITH PLANNING REGULATIONS. The

responsible official's failure to state that 36 C.F.R. §219.9 is directly

applicable, and discuss and apply that provision, is arbitrary and capricious

and violates the 2012 Planning Rule.

141.  NONCOMPLIANCE WITH PLANNING REGULATIONS. The

responsible official's failure to determine whether elk are a potential species

of conservation concern, and if so, apply section § 219.9(b) with respect to

elk as if it were an species of conservation concern, is arbitrary and

capricious and violates the 2012 Planning Rule.

142.  For all of these reasons, the Forest Plan amendment and Project EA violate

NEPA, NFMA, the APA, and the 2012 NFMA Planning Rule.

SECOND CLAIM FOR RELIEF

*In violation of NEPA, the ESA, and/or the APA, the analyses in the Project BiOp*

*and/or Project EA  fail to adequately address the effects of illegal road use and*

*failure to implement the Big Belts Travel Plan on elk and grizzly bears.*

143.  All previous paragraphs are incorporated by reference.

144.  The Project EA fails to disclose and meaningfully analyze the effects and/or

cumulative effects of pervasive illegal motorized use and failure to

implement the Travel Plan on grizzly bears.  The Project EA does not

disclose the known location of illegal motorized use (at least 145 known

and reported violations) and known failure to implement the Big Belt Travel Plan (at least 74 miles of "closed-on-paper" roads not yet gated or bermed), and fails to analyze the effects and/or cumulative effects of that actual or likely reasonably forseeable motorized use on elk and grizzly bears. Instead, the Project EA assumes that all "closed-on-paper" roads have no motorized use and does not include those roads in open road density calculations or habitat effectiveness calculations, and excludes all illegal user-created routes and "decommissioned-on-paper" roads from secure habitat, and therefore fails to take a hard look at a significant aspect of the problem and offers a conclusion that runs counter to the evidence before the agency in both the elk and grizzly effects and cumulative effects analyses.

145. For the same or similar reasons, the Project BiOp is unlawful.  In sum, in the Project BiOp, FWS fails to seek out, disclose, and meaningfully analyze the effects and/or cumulative effects of pervasive illegal motorized use and failure to implement the Travel Plan on grizzly bears. The Project BiOp fails to meaningfully address known law enforcement data documenting illegal motorized use, the known failure to implement the Travel Plan, and the known failure rate of closure devices.  Without full disclosure of this data, and without meaningful analysis of this available information in the environmental baseline, effects, and/or cumulative effects sections, the

jeopardy analysis of the BiOp is invalid.

146. The agencies' boilerplate assertions that unauthorized motorized access is unpredictable and therefore its effects on grizzly bears are unknowable must once again be rejected.

147. Additionally, the agencies' assumption that "closed-on-paper" and/or "decommissioned-on-paper" roads will receive no motorized use from the public has proven time and time again to be an incorrect assumption.

148. The analyses of open road density and secure habitat are simply fictitious – and therefore not a true analysis of impacts to grizzly bears – when actual motorized use is ignored in the calculations.

149. For these reasons, the Project EA and/or Project BiOp offer explanations that run counter to the evidence and therefore are arbitrary and capricious insofar as they assume the effectiveness of closure devices, claim inability to account for the effects of unauthorized motorized access despite USFS's monitoring and databases, which demonstrate capacity to account for fluctuating conditions and new information, and fail to account for inaccuracies in how roads are classified in the Forest's database despite data showing differing on-the-ground conditions.

150. For these reasons, the Project EA and/or Project BiOp fail to adequately address the issue of illegal motorized use and/or failure to implement the

Big Belts Travel Plan as that issue impacts grizzly bears and/or elk in

violation of NEPA, the ESA, and/or the APA.

THIRD CLAIM FOR RELIEF

*The Project BiOp and Project EA violate the ESA, NEPA, and/or APA because*

*they do not adequately address the baseline or cumulative effects on grizzly bears*

*from logging and/or roads on private and/or State lands.*

151.   All previous paragraphs are incorporated by reference.

152.   A biological opinion must address cumulative effects, which are defined by

regulation as "those effects of future State or private activities, not

involving Federal activities, that are reasonably certain to occur within the

action area of the Federal action subject to consultation." 50 C.F.R. §

402.02.

153.   The Project BiOp repeatedly acknowledges the facts that both roads and

logging impact grizzly bears, and generally admits that there are significant

amounts of logging and roads within the Project's "action area" outside

National Forest lands on State and private lands.  The Project BiOp also

anticipates that future activities on private and State lands will occur and

impact grizzly bears. Nonetheless, the Project BiOp never discloses any

quantified or detailed information regarding the amount and specific

location of the past, present, and reasonably foreseeable activities on State

and/or private lands.  Nor does the Project BiOp indicate whether FWS ever attempted to obtain this information, or whether this information is unavailable.

154.   This failure to include an accurate baseline and meaningful cumulative effects analysis of the actual landscape experienced by grizzly bears – i.e. all lands regardless of ownership –  is particularly important given the extremely low level of secure habitat already in the action area (36% when the science calls for 68%), as well as the fact that the Project will reduce secure habitat further with large-scale temporary road-building and road reconstruction actions (over 60 miles) on National Forest lands.  Although the agencies attempt to minimize the reduction of secure habitat as temporary, in truth the science establishes that these will likely be long-term, generational effects.

155.   Moreover, the State's grizzly specialist emphasized that the Project BiOp should focus on connectivity (i.e. a grizzly bear's ability to move through the Big Belts based on road densities and the locations of secure habitat) because of the importance of the Big Belts as a corridor to genetically connect the Northern Continental Divide and Greater Yellowstone grizzly populations, a connection which is mandatory for the long-term survival of the species in the lower 48 States.  The Project BiOp cannot have a valid

jeopardy analysis if it does not address the primary issue that will jeopardize grizzly bears in the long term – lack of genetic exchange.

156. Further, nowhere does FWS meaningfully consider the glaringly obvious possibility that it is the low level of secure habitat on National Forest lands in the Big Belts that is preventing grizzly bears from fully utilizing the otherwise available habitat in the Big Belts for home ranges as well as travel corridors.  The State FWP has already reached a similar conclusion that the lack of secure habitat on these National Forest lands is one of the primary factors displacing the elk from public to private lands; there is no reason that the same could not be true for grizzly bears as well.

157. Additionally, disclosure of the percentage of secure habitat alone is meaningless without simultaneous disclosure of the road density between the islands of secure habitat.  All lands and all relevant parameters from the best available science – the location of islands of secure habitat as well as the road density between those islands –  must be included in the BiOp's analysis for it to be a meaningful assessment of how grizzly bears will likely use the area or be prevented from using the area.

158. In sum, failing to analyze how private and State lands in the action area could further reduce secure habitat and/or could affect grizzly bears' ability to move between pockets of secure habitat is a failure to adequately

consider cumulative effects under the ESA.

159. The Project EA cumulative effects analysis includes these same deficiencies and more: the cumulative effects section of the Project EA is five sentences and provides no quantified or detailed information.

160. Thus, the cumulative effects section of the Project EA does not disclose or address any activities on State or private lands in the grizzly bear analysis unit for the Project.

161. Instead of providing a cumulative effects analysis for grizzly bears in the Project EA, the Project EA attempts to incorporate other documents by reference. However, an EA cannot lawfully incorporate other documents by reference. The cumulative effects analysis must be in the EA itself. This failure violates NEPA.

162. For these reasons, the Project EA and/or Project BiOp fail to include the cumulative effects analyses required by law, and are therefore arbitrary and capricious and in violation of the ESA, NEPA and/or the APA.

FOURTH CLAIM FOR RELIEF

*The Forest Service violated NEPA by failing to prepare a NEPA analysis for the remapping of lynx habitat on the Helena - Lewis and Clark National Forest.*

163. All previous paragraphs are incorporated by reference.

164. NEPA requires federal agencies to prepare a detailed EIS for any "major

Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c).

165. Major Federal actions "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." 40 C.F.R. § 1508.18(a) (2020).

166. Major Federal actions typically fall into one of four categories: (i) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs. (ii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based. (iii) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive. (iv) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects

include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities. Id. § 1508.18(b).

167. An EIS must provide a "full and fair discussion of significant environmental impacts," and inform "decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." Id. § 1502.1.

168. The 2019 remapping of lynx habitat on the Forest, in part, removed over 125,000 acres of previously mapped lynx habitat in the Big Belts.

169. The Project EA applies the agency's decision to remap lynx habitat.

170. The Project EA applies the Northern Rockies Lynx Management Direction only to the newly-remapped BB-02, rather than the BB-03 and BB-02 units that existed prior to the 2019 remap.

171. The Project EA authorizes logging and burning activities in areas previously mapped prior to 2019 as BB-03 and/or BB-02.

172. The 2019 remapping of lynx habitat is a major federal action that requires NEPA analysis.

173. There is no stand-alone NEPA analysis for the 2019 remapping of lynx habitat on the Helena-Lewis and Clark National Forest.

174. The Middleman Project EA does not contain a NEPA analysis for the 2019 remapping of lynx habitat on the Helena-Lewis and Clark National Forest.

175. The Forest Service's failure to prepare a NEPA analysis for the 2019 remap violates NEPA because the remap is a major federal action.  Additionally, or alternatively, the Project EA's application of/reliance on the 2019 remap violates NEPA because it constitutes improper tiering.  There must be either a programmatic NEPA analysis or a Project NEPA analysis that analyzes the direct, indirect, and cumulative effects from the the 2019 remap; the agency's failure to do either renders the Project decision arbitrary, capricious, and in violation of NEPA and the APA.

FIFTH CLAIM FOR RELIEF

*The Forest Service's failure to prepare an EIS for the Project violates NEPA.*

176. All previous paragraphs are incorporated by reference.

177. Agencies must prepare an EIS for federal actions that will "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)

178. An EIS is required when an EA raises "substantial questions" that an agency action will have a significant environmental effect.

179. In challenging an agency decision not to prepare an EIS, plaintiffs need not prove that significant environmental effects will occur; they need only raise a substantial question that they might. This presents a low standard that is permissive for environmental challenge.

180. The Council on Environmental Quality has adopted regulations governing

the implementation of NEPA. In determining whether a federal action requires an EIS because it significantly affects the quality of the human environment, an agency must consider what "significantly" means. The regulations give it two components: context and intensity. 40 C.F.R. § 1508.27. Context refers to the setting in which the proposed action takes place; intensity means "the severity of the impact." Id.

181.   There are ten severity factors to consider. 40 C.F.R. §1508.27.

182.   The Ninth Circuit holds: "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005).

183.   ADVERSE &/OR CUMULATIVELY SIGNIFICANT IMPACT. A full EIS is necessary for the Project because it may have a cumulatively significant impact. The Project authorizes 53,151 acres of tree cutting and burning activities, 46 miles of new road construction, and 90 miles of road reconstruction or reconditioning of haul routes for logging, over the next 20 years.  Moreover, the high existing road density and lack of cover in this Project area (which already violates numerous Forest Plan standards)– in addition to roads and logging activities (past, present, and reasonably foreseeable) on State lands and private lands in the Project area or nearby – indicate a likelihood of a cumulatively significant impact. Road activities

and logging activities at this level have severe displacement effects on native wildlife such as elk and grizzly bears, exacerbate the spread of noxious weeds, and also degrade critical ecological resources such as soil and water quality.

184.   ADVERSE EFFECT TO ESA SPECIES. A full EIS is necessary for the Project because it is likely to adversely affect grizzly bears. Roads pose the greatest threat to grizzly bears and this Project area is a linkage corridor for bear attempting to travel between the Northern Continental Divide and Greater Yellowstone Ecosystems. The level of logging and roading authorized by the Project will likely displace these bears out of this area for the duration of this 20-year project, thereby eliminating any potential for breeding in this area and further retarding recovery of this population. This factor alone indicates that an EIS is necessary.

185.   VIOLATION OF FOREST PLAN STANDARDS & NFMA REGULATIONS.  A full EIS is also necessary because the Project violates multiple Forest Plan standards, and the Forest Service authorized a Forest Plan amendment to exempt the Project from these standards.  As set forth above, the Forest Plan amendment violates the NFMA regulations. Additionally, the Forest Plan amendment analysis is unlawful because the amendment is significant and therefore requires an EIS, either separately or

with this Project.

186.   For all of these reasons, Plaintiffs have raised substantial questions whether

the Project may have a significant effect, and an EIS is required under

NEPA. The Forest Service has failed to set forth a convincing statement of

reasons that the Project will not have a significant impact.

## VII. RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the

following relief:

A.   Declare that the Project violates the law;

B.   Either vacate the Project decision or enjoin implementation of the Project;

C.   Award Plaintiffs their costs, expenses, expert witness fees, and reasonable

attorney fees under EAJA; and

D.   Grant Plaintiffs any such further relief as may be just, proper, and equitable.

Respectfully submitted this 26th Day of September, 2023.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiffs